**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS, TYLER DIVISION**

| | |
|---|---|
| KERRY MAX COOK,                              ) | |
|                                    ) | |
|          Plaintiff,                   ) | |
|                                      ) | |
|          v.                               ) | |
|                                      ) | **JURY TRIAL DEMANDED** |
| CITY OF TYLER, Texas, SMITH COUNTY,    ) | |
| Texas, EDDIE CLARK, ERIC LIPTAK,        ) | |
| DOUGLAS COLLARD, ROBERT BOND,         ) | |
| GERALD HAYDEN, NELSON DOWNING,     ) | |
| FRED MAYO, KENNETH FINDLEY,            ) | |
| RONALD SCOTT, RONNIE MALLOCH,       ) | |
| MARVIN T. McLEROY, STUART               ) | |
| DOWELL, ROBERT WICKHAM, JAKE        ) | |
| MASSEY, J.B. SMITH, GENE CARLSON,      ) | |
| UNKNOWN TYLER POLICE OFFICERS,     ) | |
| UNKNOWN SMITH COUNTY SHERIFF'S    ) | |
| DEPUTIES, JIMMY TOLER, City of Tyler    ) | |
| Police Chief, in his official capacity, LARRY   ) | |
| SMITH, Smith County Sheriff, in his official   ) | |
| capacity,                                        ) | |
|          Defendants. | |

## **COMPLAINT**

NOW COMES Plaintiff, KERRY MAX COOK, by his attorneys LOEVY & LOEVY,

and complaining of Defendants CITY OF TYLER, TEXAS, SMITH COUNTY, TEXAS,

EDDIE CLARK, ERIC LIPTAK, DOUGLAS COLLARD, ROBERT BOND, GERALD

HAYDEN, NELSON DOWNING, FRED MAYO, KENNETH FINDLEY, RONALD SCOTT,

RONNIE MALLOCH, MARVIN.T. McLEROY, STUART DOWELL, ROBERT WICKHAM,

JAKE MASSEY, J.B. SMITH, GENE CARLSON, UNKNOWN TYLER POLICE OFFICERS,

UNKNOWN SMITH COUNTY SHERIFF'S DEPUTIES, JIMMY TOLER, Chief of Tyler

Police Department, in his official capacity, LARRY SMITH, Smith County Sheriff, in his

official capacity, states as follows:

## INTRODUCTION

1.      Plaintiff Kerry Max Cook was wrongfully arrested, charged, prosecuted and convicted of the brutal rape and murder of Linda Jo Edwards. The crime occurred in Tyler, Texas in 1977.

2.      Cook was completely innocent of this crime yet was forced to endure a nightmarish ordeal of more than 20 years in prison before he finally won his freedom. He was convicted not based on evidence, but on the basis of a homosexual witch-hunt by the police investigators. As a result of that witch-hunt, obvious evidence pointing to the victim's married, 45-year-old disgruntled ex-lover, James Mayfield, was actively and systematically disregarded, downplayed, and concealed.

3.      For instance, the victim's roommate reported that immediately after the murder, she saw ex-boyfriend Mayfield in the victim's bedroom, where her body was found the next morning. Ample additional evidence available from the early days of the investigation also pointed to Mayfield: he had just been fired from his university job because of his extramarital affair with his 22-year-old secretary, the victim in this case; prior to the crime Mayfield was reported to have possessed a law enforcement treatise on sex crimes containing examples of sexual mutilation similar to what was done to the victim; and after the crime Mayfield was reported to have been asking how to beat a polygraph test.

4.      Following Plaintiff's conviction, DNA testing conclusively established that semen from Mayfield was found on the victim's underwear. Mayfield ultimately admitted that he had lied for nearly 40 years about his relationship and interactions with the victim in the days leading up to her death. Despite all of this evidence, Mayfield was never prosecuted or convicted.

5.      Instead, based on the "sexually deviant" acts inflicted on the victim, the Defendants set out to pin the murder on someone who was homosexual. The Defendants believed Plaintiff was a homosexual, and made him their target. But lacking any credible evidence to suggest that Plaintiff was involved with the crime – indeed, none of the blood, hair or other physical evidence from the scene has ever tied Plaintiff to the crime – they set about fabricating evidence to make their case. Defendants manufactured a deliberately false fingerprint analysis, coerced false statements and testimony from various witnesses, and created knowingly and recklessly false investigative materials.

6.      In addition, in an attempt to ensure that Plaintiff was convicted despite his innocence, Defendants concealed crucial exculpatory evidence and fabricated inculpatory evidence – including coerced false testimony from jailhouse informants and other witnesses – to corroborate the sham findings of the false fingerprint analysis.

7.      As a result of their misconduct, Plaintiff spent more than 20 years in prison, nearly all of them on death row, as well as another 18 years after his release, seeking to clear his name for a crime he did not commit. Because of the police misconduct, in prison he endured unimaginable horrors – including repeated sexual abuses – that changed him forever.

8.      Ultimately, the criminal case against Plaintiff fell apart. On June 6, 2016, Plaintiff's conviction was vacated by a Texas court after prosecutors acknowledged that the evidence against Plaintiff was lacking, and that Plaintiff's due process rights had been violated.

9.      Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' egregious misconduct.

**JURISDICTION AND VENUE**

10.     This action is brought pursuant to 42 U.S.C. § 1983 and Texas law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

11.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resided in this judicial district at the time of the events, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**PARTIES**

13.     Plaintiff Kerry Max Cook spent 22 years in prison – nearly all of them on death row – for a crime he did not commit.

14.     Defendants Eddie Clark, Eric Liptak, Robert Bond, Gerald Hayden, Nelson Downing, Fred Mayo, Kenneth Findley, and Ronald Scott are current and former officers of the City of Tyler Police Department involved in supervising and conducting the Edwards murder investigation.

15.     Defendant Douglas Collard is a former officer of the City of Tyler Police Department involved in supervising and conducting the Edwards murder investigation.

16.     Defendant Ronnie Malloch is the former Chief of the Tyler Police Department involved in supervising and conducting the Edwards murder investigation. At relevant times, he was the final policymaking authority for the Tyler Police Department.

17.     Defendant Marvin T. McLeroy is a former officer of the Texas Department of Public Safety involved in conducting polygraph tests related to the Edwards murder investigation.

18.     Defendant Stuart Dowell is a former officer of the Texas Department of Public Safety involved in conducting the Edwards murder investigation.

19.     Defendants Robert Wickham and Jake Massey are former sheriff's deputies in the Smith County Sheriff's Office involved in conducting the Edwards murder investigation.

20.     Defendant J.B. Smith ("J.B.") is the former Sheriff of Smith County involved in supervising the Edwards murder investigation. At relevant times, he was the final policymaking authority for the Smith County Sheriff's Office.

21.     Defendant Gene Carlson is the former Chief Jailor of the Smith County Jail and at all relevant times was an employee and/or agent of the Smith County Sheriff's Office.

22.     Defendants Clark, Liptak, Collard, Bond, Hayden, Downing, Mayo, Findley, Scott, Malloch, McLeroy, Dowell, Wickham, Massey, J.B., Carlson, Unknown Tyler Police Officers, and Unknown Smith County Sheriff's Deputies are referred to collectively as the "Police Defendants" throughout this Complaint.

23.     Defendant Jimmy Toler is the current Chief of Police for the City of Tyler Police Department. He is sued in his official capacity. As Chief, Defendant Toler oversees the Tyler Police Department, which was the employer of Defendants Clark, Liptak, Collard, Bond, Hayden, Downing, Mayo, Findley, Scott and Malloch, and Unknown Police Officers of the City of Tyler. In addition, each of the other Police Defendants acted as an agent of the Tyler Police Department while investigating the Edwards murder. The City of Tyler is liable for all torts committed by the Police Defendants while employed by or acting as agents of the Tyler Police

Department pursuant to the doctrine of *respondeat superior*. Defendant Toler is additionally responsible for the policies and practices of the Tyler Police Department.

24.     Defendant Larry Smith is the current Smith County Sherriff. He is sued in his official capacity. As Sheriff, Defendant Smith oversees the Smith County Sheriff's Office, which was the employer of Defendants Wickham and Massey, and Unknown Sheriff's Deputies of Smith County. In addition, each of the other Police Defendants acted as an agent of the Smith County Sheriff's Office while investigating the Edwards murder. Smith County is liable for all torts committed by the Police Defendants while employed by or acting as agents of the Smith County Sheriff's Office pursuant to the doctrine of *respondeat superior*. Defendant Smith is additionally responsible for the policies and practices of the Smith County Sheriff's Office.

25.     Defendant City of Tyler is a Texas municipal corporation that is or was the employer of Defendants Clark, Liptak, Collard, Bond, Hayden, Downing, Mayo, Findley, Scott and Malloch, and Unknown Police Officers of the Tyler Police Department. In addition, each of the other Police Defendants acted as an agent of the City of Tyler while investigating the Edwards murder. The City of Tyler is liable for all torts committed by the Police Defendants while employed by or acting as agents of the City of Tyler pursuant to the doctrine of *respondeat superior*. Defendant City of Tyler is additionally responsible for the policies and practices of the Tyler Police Department.

26.     Defendant Smith County is a county of the State of Texas; its county seat is Tyler, Texas. Smith County is or was the employer of Defendants Wickham and Massey, and Unknown Sheriff's Deputies of the Smith County Sheriff's Office. Each of the other Police Defendants acted as an agent of Smith County while investigating the Edwards murder. The Smith County Sheriff's Office is a short walk from the Tyler Police Department, and the two law enforcement

agencies routinely worked together. Smith County is liable for all torts committed by the Police

Defendants while employed by or acting as agents of the Smith County Sheriff's Office pursuant

to the doctrine of *respondeat superior*. Defendant Smith County is additionally responsible for

the policies and practices of the Smith County Sheriff's Office.

27.     Defendants Unknown Police Officers of the City of Tyler, Unknown Sheriff's

Deputies of the Smith County Sheriff's Office, and Unknown Police Officers of Unknown Law

Enforcement Agencies participated in the misconduct alleged in this Complaint (collectively

"Unknown Police Officers"). At all times relevant to the events described in this Complaint,

these Unknown Police Officers were acting under color of law and within the scope of their

employment with their respective law enforcement agencies and as agents of the Tyler Police

Department and the Smith County Sheriff's Office.

28.     Each of the individual Defendants acted under color of law and within the scope

of his employment. Each of the individual Defendants is sued in his individual capacity unless

otherwise noted.

## FACTS

### The Rape and Murder of Linda Jo Edwards

29.     In the summer of 1977, Linda Jo Edwards lived at the Embarcadero Apartments

in Tyler, Texas. She lived with a roommate, Paula Rudolph, with whom she worked at Texas

Eastern University. Edwards and Rudolph each had their own room in the small two-bedroom

apartment.

30.     At some point between 10:30pm on June 9, 1977 and 12:30am on June 10, 1977,

the murderer came into the apartment without making a forced entry and brutally raped and

murdered Edwards, striking her in the head with a statue and stabbing her all over her body with

a knife and scissors. It was a gruesome murder that drew substantial attention from the community in Tyler.

31.     Paula Rudolph, the victim's roommate, had gone out for drinks from 10:30pm to almost exactly 12:30am that night. When she walked in the door to the apartment at 12:30am, she saw a man in Edwards' room she recognized to be James Mayfield, the Texas Eastern University Dean of Library Services, who until very recently had been having an extramarital affair with Edwards. Rudolph knew Mayfield well, because she too worked for him at the university, and the description of the man she saw in Edwards' room fit Mayfield perfectly: sleek and slender, with a tan, silver hair of medium length that touched his ears, and wearing white tennis shorts. Mayfield was an avid tennis player and regularly wore white tennis shorts, and was apparently seen earlier that day in white tennis shorts.

32.     Because she recognized the figure, Rudolph was not concerned, and simply said "Don't worry it's only me," and went straight to bed. Within a few minutes, without hearing any cries or commotion, she heard a person leave the apartment, and then a short time later she fell asleep. The next morning she found the patio door open, and then went into Edwards' room where she found Edwards dead.

33.     The Police Defendants, law enforcement officers from the Tyler Police Department and other law enforcement agencies, investigated the crime. They quickly learned that Mayfield was seen in the victim's room at the time of death.

34.     They learned, too, that Mayfield had a motive to commit the murder. At the time of his affair with Edwards, Mayfield was a married father and had a respectable position at Texas Eastern University. Edwards had worked for him as his personal secretary. Shortly before Edwards' death, Mayfield had filed for divorce and left his wife and children to move into an

apartment at the Embarcadero with Edwards. After only a few days living with Edwards, Mayfield left her and returned to his wife, after which Edwards attempted suicide.

35.     Mayfield and Edwards' affair became public. As a result, Mayfield was fired, his marriage was in trouble, and his daughter was furious.

36.     Notwithstanding these repercussions, Mayfield could not stay away from Edwards and kept returning to their volatile relationship.

37.     Over the course of almost two months of investigation, Defendants learned of ample additional evidence pointing to James Mayfield.

38.     They also obtained evidence pointing to a number of additional possible suspects. But despite the evidence pointing to James Mayfield and the other suspects, within the first few days of the investigation the Police Defendants committed themselves to the false and discriminatory idea that the gruesome nature of the attack meant that the perpetrator had to have been a "deviant homosexual." Neither Mayfield nor any of the other suspects fit their homosexual profile.

**Kerry Max Cook**

39.     The Police Defendants believed Plaintiff fit their profile. In the first days of August, in the course of canvassing all of the apartments in the Embarcadero complex for known homosexuals, Plaintiff came across their radar. The Police Defendants became convinced that he was a homosexual, in part because he had spent time working at gay nightclubs in Dallas, and had been temporarily staying with a gay acquaintance at the same apartment complex at the time.

40.     At the time of the murder, Plaintiff Kerry Max Cook was 21 years old. He had grown up as an "army brat" with his father in the U.S. Army stationed overseas. After his father's retirement from the military in 1973, his family moved from Fort Hood in Killeen, Texas

to Jacksonville, Texas, where they soon opened a restaurant. He had spent the last few years

working in various cities as a bartender. In early June, he came to Tyler and found temporary

lodging with an acquaintance, James Taylor, at the Embarcadero Apartments, which was the

same complex where Edwards lived.

41.     From the outset, Plaintiff maintained his innocence. Moreover, he informed the

Defendants that he had a clear alibi. Plaintiff had spent the day with other people, namely, James

Taylor's nephews, and later that evening, with a friend of Taylor's named Robert Hoehn.

Plaintiff and Hoehn were together in the apartment and also went together to buy cigarettes at the

very time that the murder was taking place elsewhere in Edwards' apartment, thus demonstrating

that Plaintiff could not have committed the crime.

42.     The Police Defendants had ample additional evidence that Plaintiff was innocent.

43.     Plaintiff absolutely did not match Paula Rudolph's description of the perpetrator.

Plaintiff had long, dark brown hair that went down to his shoulders, and multiple witnesses had

reported that on the night of the murder he had been wearing blue and red swim trunks and put

blue jeans on over them when he went to the store with Hoehn. Plaintiff's long hair also covered

his ears, which further differentiated him from the person Rudolph described.

44.     When the Police Defendants came to question him, Plaintiff readily consented to

a search and police searched his car and his apartment and found no evidence whatsoever

connecting him to the crime.

45.     The only evidence ever tying Plaintiff to the crime was the presence of his

fingerprint on a sliding door in the common area (*i.e.*, not the bedroom where the crime

occurred) of Edwards and Rudolph's apartment. But that fingerprint was easily explained by the

fact that Plaintiff had met Edwards once, earlier that week. Both were staying at the same

apartment complex, and Edwards actually brought Plaintiff into her apartment the day they met, a few days before she was found dead.

46.     The Police Defendants knew that Plaintiff had met Edwards earlier in the week, and no fewer than three witnesses confirmed for the police the date of that meeting. Notwithstanding the fact that they knew the actual, innocent reason for Plaintiff's fingerprint, the Police Defendants still falsely used the fingerprint as evidence of Plaintiff's supposed guilt based on their homosexual "profile" of the killer. Specifically, they did so by creating false statements from the witnesses who told them about the meeting, and by withholding police investigative notes containing this exculpatory information from Plaintiff.

47.     Lacking probable cause for Plaintiff's arrest and prosecution, the Police Defendants set out to make a case against Plaintiff through false and fabricated evidence, as set forth below.

48.     Plaintiff has steadfastly proclaimed his innocence. Because of the indescribable horrors he experienced over almost two decades on death row for a crime of which he was wrongfully convicted, Plaintiff attempted to commit suicide in prison more than once. His suicide note read: "I really was an innocent man."

**The Obvious Suspect James Mayfield**

49.     As set forth above, numerous leads pointed to the victim's lover, James Mayfield. Not only had he been seen in the victim's room, he had an obvious motive: Edwards had recently taken actions that publicly exposed their affair, as a result of which Mayfield had just been fired from Texas Eastern University, his marriage was falling apart, and his daughter was acting out.

50.     As discussed above, Rudolph immediately recognized James Mayfield as the person in Edwards' room the night of the murder. The next morning, after calling the police, she

told multiple people that the person in the room *was* James Mayfield. She then met with

Defendants Eddie Clark and Nelson Downing and provided the same information, but the Police

Defendants prepared a witness statement for Rudolph to sign that excluded that crucial fact.

Instead, they coerced Rudolph into signing a statement that said she "assumed" it was Mayfield.

51.     In his own police report of the interview with Rudolph, written on June 13, 1977,

at a point when the Police Defendants had already committed to pinning the murder on a

homosexual, Defendant Clark left out James Mayfield's name and every aspect of her

description of the person she saw that matched James Mayfield.

52.     Over the ensuing weeks, the Police Defendants coerced Rudolph into changing

her story and eventually convinced her to entirely change her description, disavow the claim that

it was James Mayfield, and instead falsely point the finger at Plaintiff, without disclosing

anything about their actions to procure this false testimony.

53.     Other witnesses reported to the Police Defendants that Rudolph had said the

person she saw was Mayfield. Reports of those interviews and statements were not disclosed to

Plaintiff and were instead suppressed or destroyed so that they were not available to Plaintiff at

trial.

54.     In addition to tampering with the Rudolph evidence, the Police Defendants buried

evidence that came directly from Mayfield.  The Police Defendants concealed evidence that

Mayfield had lied when he claimed that he had not seen Edwards in weeks and suppressed or

destroyed reports of various witnesses' interviews and statements linking Mayfield and Edwards.

55.     The Police Defendants received numerous additional tips, leads and information

from witnesses pointing to Mayfield and away from Plaintiff: Mayfield had admitted to failing

multiple polygraph tests in the days after the murder; in the days after the murder he had asked a

colleague how to beat a polygraph test; and he had been seen with a law enforcement treatise containing graphic depictions of sexual mutilation similar to what was done to Edwards. The information about the graphic book and the efforts to beat a polygraph, for example, were reported directly to Defendant Ronnie Malloch, the Chief of the Tyler Police Department. The Police Defendants concealed this evidence. Instead, reports of the interviews and statements that those witnesses made to the Police Defendants were suppressed or destroyed.

56.     The Police Defendants had additional troubling evidence pointing to the Mayfield family. The Police Defendants learned that just two weeks before the murder, James Mayfield's daughter, Louella Mayfield, had been going to apartments around Tyler identifying herself as a Tyler police officer and stating that she was investigating a murder involving James Mayfield and Linda Jo Edwards. In addition, approximately 3-5 days before the murder, Louella Mayfield had gone to Texas Eastern University and threatened to kill Edwards because of her affair with Louella's father. Defendant Hayden wrote in a police report concealed from Plaintiff that Louella was "mentally and emotionally unstable, very hyper, and a pathological liar."

57.     In addition, the Police Defendants found Louella Mayfield to have in the trunk of her car a suspicious pair of wet blue jeans with a green substance and stains on the bottom, which they took into their custody. Meanwhile, a "mysterious green leafy substance" was discovered in Edwards' closet next to where the knife used in the murder was found. Yet, the Police Defendants never disclosed any test results of either the substance found on the jeans or the jeans themselves, and instead the jeans mysteriously disappeared without explanation.

58.     Following Plaintiff's conviction, DNA testing done on sperm found in the underwear Edwards had been wearing that night was definitively proven to have come from James Mayfield. To this day he remains the only person tied to the crime by physical evidence.

13

59.     In addition, the Police Defendants improperly destroyed biological evidence that likely would have inculpated Mayfield in the crime and exculpated Plaintiff. One such piece of key evidence was a hair found on the victim's body.  The potentially exculpatory value of the hair sample was apparent. The hair was found on the victim's buttocks with a bloody root, after she had been brutally raped and murdered. Its relevancy was obvious as well, and indeed the Police Defendants sought to have it tested but then failed to disclose any results associated with that testing before they destroyed the hair evidence itself.

60.     Despite the obvious relevancy and exculpatory value of this hair evidence, Defendants Clark, Collard, and others caused the hair sample to be destroyed without allowing Plaintiff the opportunity to have it tested himself. The Police Defendants did so in bad faith, without authorization and in violation of applicable Texas law.

61.     The Police Defendants destroyed, or caused to be destroyed, these and other actually or potentially exculpatory pieces of evidence that could have linked evidence from the crime scene to the real perpetrator.

**Ignore Numerous Other Leads**

62.     In addition to the many leads pointing to James Mayfield, the Police Defendants downplayed, suppressed or destroyed other leads they had pointing to potential suspects that did not fit their predetermined profile of the killer.

63.     By way of example, one such suspect was Greg Smith. He was one of the last people to see the victim. It was reported to the Police Defendants that he was at the Embarcadero at the apartment of two friends the night of the murder. Edwards joined them from approximately 10:00 pm to 10:25 pm and then informed them that she was going back to her apartment, and would be there alone. Smith watched her walk back to her apartment, and then stayed at his

friends' apartment until before midnight when he left alone. He was wearing white tennis shorts. The Police Defendants administered a polygraph examination on Smith, which he failed when asked the question "Do you know who killed Linda Jo Edwards?" The Police Defendants concealed this evidence. Instead, reports of the interviews and statements that those suspects made to the Police Officer Defendants were suppressed or destroyed.

## Further Steps to Frame Kerry Max Cook

64.     With hardly a scintilla of evidence against Plaintiff, and a mountain of compelling evidence against James Mayfield and other suspects, the Police Defendants were severely lacking in evidence of probable cause against Plaintiff.

65.     The Police Defendants therefore set out to manufacture false evidence in an effort to frame Plaintiff for rape and murder, while concealing the fact that their manufactured evidence was false. The Police Defendants also improperly coerced, encouraged, and manipulated witnesses to falsely implicate Plaintiff in the crime, without disclosing anything about their actions to procure this false testimony.  And independent of the serious misconduct described above, the Police Defendants repeatedly and deliberately withheld evidence that further demonstrated Plaintiff's innocence.

66.     The first crucial fabrication came in the form of a completely bogus and fabricated claim by Defendant Sergeant Doug Collard of the Tyler Police Department, in collaboration with Defendant Clark and the other Police Defendants, about Plaintiff's fingerprints found in a single location in the common area of the victim's apartment: namely, Collard fabricated the "fact" that the fingerprints were eight to twelve hours old when Defendant Collard lifted them at 9am on June 10, 1977. That is, Defendant Collard claimed that they had been placed there right around the time of Edwards' murder. This fabricated claim was created

because the Police Defendants knew that at least three witnesses had already told them that Plaintiff had been at Edwards' apartment a few days earlier, so there was an obvious and exculpatory explanation for why Plaintiff's fingerprint was at the apartment.

67.     Years later, Defendant Collard was forced to recant his claim that Plaintiff's fingerprints had been made within hours of the murder, and ultimately conceded that his opinion was completely outside the realm of sound and supported forensic science. Federal Bureau of Investigation experts have explained that it is scientifically impossible to offer opinions like the one Defendant Collard conjured. In fact, so egregious was the falsity of Defendant Collard's opinion that he was forced to answer to the International Association for Identification for making such a bogus claim. Yet, the Police Defendants concealed documents and information about the fingerprint fabrication.

68.     The bogus claim that Plaintiff's fingerprints were made within hours of the murder was used to create probable cause where none existed and formed one of the pillars of misconduct on which Plaintiff's decades-long wrongful prosecution and conviction was built. On August 4, 1977, Defendant Clark swore out an affidavit for the arrest and charging of Plaintiff for rape and murder. In that affidavit, to support probable clause, Defendant Clark included the knowingly false, fabricated claim that Defendant Collard had determined that Plaintiff's fingerprints had been left at the time of the murder. He also falsely swore out portions of the affidavit discussing the statements of Paula Rudolph, excluding entirely her statement that the person she saw in the apartment was James Mayfield and her description of the figure.

69.     At the same time that the Police Defendants were concocting a bogus opinion to place Plaintiff's fingerprints at the scene at the time of the murder, they were also working to

actively conceal exculpatory evidence from witnesses that could explain why Plaintiff's fingerprints were found on the sliding glass door of the victim's apartment.

70.     More specifically, witnesses who had spent time with Plaintiff around the time he met Edwards informed the Police Defendants that Plaintiff had made out with the victim a few days before the murder. The apartment Plaintiff was staying at belonged to James Taylor; Randy and Rodney Dykes were Taylor's young nephews who stayed at his apartment occasionally. All three of these witnesses provided information that clearly indicated that the girl Plaintiff had met at the apartment complex was the victim, and one of them specifically mentioned that he said it was a girl named Linda and when shown a photo of the victim the witness confirmed this was the girl Linda. The Police Defendants withheld their handwritten and typed notes containing this information.

71.     The Police Defendants then proceeded to improperly coerce, encourage, and manipulate these witnesses to get them to change their testimony at Plaintiff's trials. In particular, Randy Dykes was 17 years old, and Rodney Dykes was 12-years old; they were young and impressionable and easily manipulated by the Police Defendants. This manipulation, too, was concealed, and records reflecting this manipulation were suppressed or destroyed.

72.     Similarly, the Police Defendants withheld numerous additional tips, leads, and information that pointed away from Plaintiff and showed that he had not committed Edwards' murder.

73.     In an attempt to bolster their case against Plaintiff, the Police Defendants also recruited individuals, including a number of jailhouse snitches, and elicited false testimony from these individuals implicating Plaintiff in the murder. Some of these individuals gave false

statements and testified that Plaintiff had suggested and even confessed to them that he had been involved in the crime, when, in fact, no such conversations ever took place.

74.     A particularly egregious example is the Police Defendants' recruitment of jailhouse snitch Edward "Shyster" Jackson to offer the completely fabricated claim that Plaintiff confessed to him to committing the murder, as well as a number of other inculpatory statements. The Police Defendants coerced Jackson into giving a fabricated statement, and then pursued a series of coercive and threatening acts against Jackson to ensure that he would falsely testify against Plaintiff. Among other things, the Police Defendants suppressed initial polygraph tests that Shyster Jackson failed, and drugged him with valium so that he would pass a third polygraph test. After he later recanted his false testimony against Plaintiff and admitted to being coerced and pressured, he was beaten up by the Police Defendants to the point that they broke his arm. These violent and threatening acts were taken to prevent Jackson from coming forward to testify about the falsity of his original testimony and about the police misconduct. The Police Defendants concealed documents and information about their fabrication.

75.     Jackson is merely one example. There were a number of other jailhouse snitches and other witnesses that the Police Defendants recruited and caused to provide false evidence implicating Plaintiff in the crime, all the while knowing that these statements were entirely false.

76.     To procure this false testimony, the Police Defendants made improper, undisclosed promises and offered impermissible incentives to these individuals, and they coerced others to tell lies. The entire time, the Police Defendants concealed the improper promises that they had made and their course of misconduct in securing false statements from these individuals and jailhouse snitches.  Instead, records reflecting those improprieties were suppressed or destroyed.

77.     If Plaintiff had been given access to this information about the Police Defendants'
actions to obtain false testimony from witnesses, it would have been powerful evidence of his
innocence and critical evidence by which he could have impeached both the individuals who
testified falsely against him and also the Police Defendants who testified that the evidence they
had gathered in their investigation pointed toward Plaintiff.

78.     Through the actions above and others, the Police Defendants also produced a
series of false and fraudulent police reports and related memoranda, which they inserted into
their case file. These documents, which were evidence used to show Plaintiff's purported
connection to the crime, contained statements and described events that were fabricated and that
the Police Defendants knew to be false. The Police Defendants prepared and signed off on these
reports, both as investigators and as supervisors, despite their knowledge that the information
contained in those reports was entirely false.

79.     The Police Defendants concealed the misconduct described above from Plaintiff,
his criminal defense attorneys, and the prosecutors involved in his criminal case. Indeed, the
Police Defendants continue to this day to conceal evidence in their possession demonstrating
Plaintiff's innocence; and they continue to hide their own fabrication of evidence and their
improper manipulation of witnesses.

80.     The misconduct of the Police Defendants includes that of the supervisors, who
knew full well of the Police Defendants' misconduct and their fabrication of a case against
Plaintiff. These supervisors nevertheless intentionally ignored and approved the Police
Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not
commit, rather than directing the officers to go out and find the person who had raped and killed
Linda Jo Edwards.

81.     The Police Defendants' misconduct deprived Plaintiff of evidence that would have established further that he had no connection to Edwards' rape and murder and that would have pointed toward the person who had actually committed the crime.

**Plaintiff's Wrongful Conviction and Imprisonment**

82.     Even though Plaintiff was absolutely innocent of the murder, and the Defendants had no legitimate evidence against him that would support a finding of probable cause, Plaintiff was charged and prosecuted for the murder of Linda Jo Edwards. He was convicted of capital murder in 1978, and sentenced to death for a crime he did not commit.

83.     As a direct result of the Defendants' misconduct, Plaintiff was falsely arrested, wrongfully prosecuted, wrongfully convicted of capital murder, and wrongfully imprisoned. Plaintiff spent more than two decades fighting for his life from a prison cell on death row, and he lived branded as a raping sex offender and deviant homosexual murderer for almost four decades.

84.     Without the Defendants' extreme misconduct described herein, Plaintiff would never have been arrested, prosecuted or convicted.

**Plaintiff's Exoneration**

85.     On June 6, 2016, Plaintiff's conviction was vacated, and all charges and attempts at re-prosecution were dropped.

86.     Smith County prosecutors agreed to throw out the conviction and charges against Plaintiff, in part because James Mayfield had recently admitted for the first time that he had sex with the victim the day before her murder, and that he had given false and perjurous trial testimony leading to Plaintiff's conviction. The prosecutors admitted that Plaintiff's constitutional due process rights had been violated.

87.     Plaintiff's four-decade nightmare was finally over, but for the wounds from that fight for his life that will remain open for the rest of his life. Plaintiff's whole life was turned upside down without any warning. Plaintiff's 20s, 30s, 40s and 50s – well more than the majority of his life as of the date of this Complaint – have been consumed by the horror of his wrongful prosecution and imprisonment.

88.     Because of the Defendants' misconduct, Plaintiff was taken away from his family and friends. He has missed out on all the profound moments of their lives. These familial and social relationships and shared experiences that are a centerpiece of every person's ability to experience joy and meaning were lost, and upon his release they were unsalvageable, due to death and the passage of time.

89.     Plaintiff was stripped of his young and middle adulthood, he was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

90.     During his more than two decades of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum security prison. His ordeal can only be described as a horror.

91.     Plaintiff had been labeled a sexual deviant and was convicted of violently raping and murdering a young woman. The infamous prison culture in which Plaintiff was detained was unforgiving, and prisoners exacted their own revenge. Plaintiff suffered a number of violent attacks. He was raped and sodomized dozens of times, sometimes in gang fashion.

92.     In addition, because Plaintiff had been sentenced to death, he lived every day with the fear that he would one day be put to death by the State of Texas for someone else's crime.

93.     In addition to the severe trauma of wrongful prosecution and imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, anger, and other physical and psychological effects.

## COUNT I
## 42 U.S.C. § 1983 -- Due Process

94.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

95.     As described in detail above, the Police Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

96.     In the manner described more fully above, the Police Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

97.     In addition, the Police Defendants fabricated and solicited false evidence, including testimony that they knew to be false and perjured and fabricated police reports, implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

98.     In addition, the Police Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

99.     The Police Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the

Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

100.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

101.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT II**
**42 U.S.C. § 1983 – Illegal Detention/Malicious Prosecution**

102.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

103.    In the manner described above, the Police Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to unreasonably seize him and initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

104.    Through their misconduct, the Police Defendants caused Plaintiff to be unreasonably seized without probable cause during the entirety of his wrongful prosecution and conviction.

105.    Through their misconduct, the Police Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

106.    Based on the above, these Defendants maliciously caused Plaintiff to be unreasonably seized and subjected improperly to judicial proceedings, resulting in injury.

107.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence, and the proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

108.    The State of Texas does not provide an adequate post-deprivation state tort remedy for the more than two decades of wrongful incarceration Plaintiff suffered as a result of his illegal detention and malicious prosecution. This includes but is not limited to the fact that the Texas Tort Claims Act absolutely immunizes governmental employees such as the Police Defendants acting within the scope of their employment, and it absolutely immunizes governmental units from suit for intentional torts, including false arrest and malicious prosecution.

109.    As a result of the Police Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count III – 42 U.S.C. § 1983
### Violation of Substantive Due Process

110.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

111.    As described more fully above, the Police Defendants, while acting under color of law and within the scope of their employment, deprived Plaintiff of his rights under the Fourteenth Amendment to the U.S. Constitution.

24

112.     In the manner described more fully above, the Police Defendants engaged in deliberative, arbitrary, and conscience-shocking behavior by fabricating false evidence, deliberately withholding material exculpatory evidence from Plaintiff, providing false inculpatory evidence used to obtain Plaintiff's wrongful conviction at his criminal trial, and coercing witnesses to testify falsely and provide false statements used to convict Plaintiff at his criminal trial. As a result of the Police Defendants' misconduct, Plaintiff was wrongfully convicted and imprisoned. Thus, Defendants violated Plaintiff's right to substantive due process guaranteed by the Fourteenth Amendment to the U.S. Constitution.

113.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with deliberate indifference to Plaintiff's constitutional rights.

114.     As a result of the Police Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IV – 42 U.S.C 1983
### Destruction of Evidence

115.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

116.     In the manner described more fully above, one or more of the Police Defendants destroyed evidence that Plaintiff could have used to further prove his innocence.

117.     The exculpatory value of that evidence was apparent to the Police Defendants.  In the alternative, the evidence was potentially exculpatory, and the Police Defendants knew that.

118.     Nonetheless, the Police Defendants negligently destroyed the evidence.  In the alternative, Defendants acted in bad faith in destroying the evidence.

119.     The evidence had unique evidentiary value, and Plaintiff could not obtain comparable evidence by any other means.

120.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with deliberate indifference to Plaintiff's constitutional rights.

121.    As a result of the Police Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count V – 42 U.S.C. § 1983
### *Monell*

122.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

123.    Plaintiff's injuries were caused by the policies and practices of the City of Tyler and Smith County in that Defendants Malloch and J.B. Smith were the final policymakers of the Tyler Police Department and Smith County Sheriff's Office, respectively, and the final policymakers of City of Tyler and Smith County in the area of law enforcement at all relevant times, and they took the unconstitutional actions against Plaintiff described above.

124.    Furthermore, Plaintiff's injuries were caused by the policies, practices, and customs of Defendants City of Tyler and Smith County, in that employees and agents of the City of Tyler and Smith County and its constituent agencies and municipalities – including the Tyler Police Department and the Smith County Sheriff's Office – regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, elicited false and coerced witness testimony, pursued wrongful prosecutions and convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

125.     The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the City of Tyler Police Department and Smith County Sheriff's Office, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Tyler Police Department and Smith County Sheriff's Office declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and coerced witness testimony, and pursued wrongful convictions, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

126.     The misconduct described in this Count was undertaken pursuant to the policy and practices of the Tyler Police Department and Smith County Sheriff's Office in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the Tyler Police Department and Smith County Sheriff's Office, or were actually committed by persons with such final policymaking authority.

127.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

128.     As a result of the misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

129.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

130.    After the murder of Edwards, the Police Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

131.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

132.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

133.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

134.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### 42 U.S.C. § 1983 – Failure to Intervene

135.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136.    In the manner described above, during the constitutional violations described herein, one or more of the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

137.    As a result of the Defendants' failure to intervene to prevent the violation of

Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

138.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, reckless indifference to the rights of others, and in total

disregard of the truth and Plaintiff's clear innocence.

139.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VIII
### State Law Claim – Malicious Prosecution

140.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

141.    In the manner described above, Defendants City of Tyler and Smith County,

through the Police Defendants, all of whom acted within the scope of their employment, falsely

accused Plaintiff of criminal activity and caused Plaintiff to be improperly subjected to criminal

prosecution for which there was no probable cause. Criminal prosecution was commenced and

continued maliciously, resulting in injury, and all proceedings were ultimately terminated in

Plaintiff's favor in a manner indicative of innocence. Also as alleged above, Plaintiff is innocent

and suffered damages.

142.    Through the Police Defendants, who acted within the scope of their employment,

Defendants City of Tyler and Smith County accused Plaintiff of criminal activities knowing

those accusations to be without genuine probable cause, and they made statements with the intent

of exerting influence to institute and continue the judicial proceedings.

143.    Statements that Defendants made through the Police Defendants, acting within the scope of their employment, regarding Plaintiff's alleged culpability were made with the knowledge that said statements were false. These Defendants also fabricated evidence and withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

144.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

145.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Intentional Infliction of Emotional Distress

146.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147.    The actions, omissions, and conduct of the Police Defendants set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

148.    As a direct and proximate result of the Police Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – Respondeat Superior

149. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

150. While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Tyler and/or Smith County, acting at all relevant times within the scope of their employment.

151. Defendants City of Tyler and Smith County are liable as principals for all torts committed by their employees and agents.

## COUNT XI
### Local Law Claim – Indemnification

152. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

153. The City of Tyler must pay any tort judgment for damages rendered against some or all of the Police Defendants in accordance with the City of Tyler Ordinances, Sec. 2-62 and any predecessors.

154. The Police Defendants were employees, members, and agents of the City of Tyler, acting at all relevant times within the course and scope of their employment in committing the misconduct described herein.


WHEREFORE, Plaintiff KERRY MAX COOK, respectfully requests that this Court enter a judgment in his favor and against Defendants CITY OF TYLER, SMITH COUNTY, EDDIE CLARK, ERIC LIPTAK, DOUGLAS COLLARD, ROBERT BOND, GERALD HAYDEN, NELSON DOWNING, FRED MAYO, KENNETH FINDLEY, RONALD SCOTT, RONNIE MALLOCH, MARVIN.T. McLEROY, STUART DOWELL, ROBERT WICKHAM, JAKE MASSEY, J.B. SMITH, GENE CARLSON, UNKNOWN TYLER POLICE OFFICERS,

UNKNOWN SMITH COUNTY SHERIFF'S DEPUTIES, JIMMY TOLER, and LARRY

SMITH, awarding compensatory damages, attorneys' fees and costs against each Defendant,

punitive damages against each of the individual Defendants, and any other relief this Court

deems just and appropriate.

### JURY DEMAND

Plaintiff, KERRY MAX COOK, hereby demands a trial by jury pursuant to Federal Rule

of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

**KERRY MAX COOK**


BY**:**     /s/ Anand Swaminathan
          *One of Plaintiff's Attorneys*


Mike Kanovitz (Illinois Bar No. 6275233)
Roshna Bala Keen (Illinois Bar No. 6284469)
Anand Swaminathan (Illinois Bar No. 6305088)
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, IL 60607
O: (312) 243-5900
F: (312) 243-5902